UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**JUDGE HOLDERMAN**

**04CR0086**

**MAGISTRATE JUDGE ASHMAN**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No.   04 CR 86 |
| | ) | |
| v. | ) | Violations: Title 18, United States Code, |
| | ) | Sections 2, 666, 1001, 1341, 1346, 1503 |
| ANGELO TORRES, | ) | 1512(b), and 1951; |
| JOHN BOYLE, | ) | Title 26, United States Code, Section 7206(1) |
| JASON MARTIN, and | ) | |
| MARTIN McDONAGH | ) | |

## COUNT ONE

**FILED**

The SPECIAL AUGUST 2003-2 GRAND JURY charges:

Jan 27, 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### The City of Chicago's HTP Program.

1.     At times material to this indictment:

A.     The City of Chicago ("the City") was a municipal corporation, and a political subdivision of the State of Illinois. The functions and services provided by the City on behalf of its residents were coordinated through various agencies and departments. Several of the largest City operational departments included the Department of Water, the Department of Streets and Sanitation ("Streets & San."), the Department of Transportation ("CDOT"), and the Department of Sewers. (On January 1, 2003, the Departments of Water and Sewers merged into a Department of Water Management.) Each of these departments was headed by a Commissioner, who was nominated by the Mayor of the City and confirmed by the City Council, the legislative body for the City. (These departments, collectively, will be referred to as "the Operating Departments.")

B.     The City operated a Hired Truck Program ("HTP"). The HTP provided the Operating Departments with a method for renting private trucking services on an as-needed

basis to complete construction and operating obligations, without the City having to purchase the trucks or hire its own employees.

      C.      Participating HTP trucking companies were hired by the City. They provided trucks and drivers to the respective Operating Departments to perform specific tasks. The Operating Departments hired some trucks on a year-round basis for particular City operations; other trucks were hired on a seasonal basis for departmental projects; and other trucks were hired for short periods of time on an as-needed basis for particular tasks.

      D.      Beginning in or about 1997, a Hired Truck Program Office ("HTP Office") was created in the City's Office of Management and Budget, which was headed by a Budget Director. The HTP Office was headed by a Director, who was appointed by the Budget Director.

      E.      The HTP Office assumed responsibility for approving the entry of new trucking companies into the HTP, after an application and review process conducted by HTP Office staff. Once a company was approved to join the HTP, the company was placed on an approved list in a database maintained by the HTP Office. The HTP Office was further responsible for ongoing monitoring and regulation of participating HTP companies and their trucks regarding insurance, inspection, safety, and related issues. The HTP Office had the authority to suspend or discipline HTP participating companies for violations of the HTP rules.

      F.      From in or about the beginning of 2002, to on or about October, 2003, the eligibility list for the HTP was officially closed to new trucking companies. During that period, several new companies were, however, added to the list.

G.     There was no bid process and no formal, written contract for any particular job within the Operating Departments. Rather, certain City employees within the respective Operating Departments with HTP responsibilities participated in the process of "calling out" or hiring trucks for a particular HTP assignment within the department ("HTP Supervisors"). An individual request for HTP services typically was made by a foreman or other supervisor to one or more of the HTP Supervisors in each department, who would determine what truck was needed, then notify the particular HTP participant as to the assignment and type of truck(s) necessary, thereby calling out the truck. The HTP Supervisors also decided when trucks were to be laid off for a particular assignment and the order in which trucks were to be laid off. Generally, these decisions were made at the discretion of the HTP Supervisors within the respective departments, though there was input provided by the HTP Office to some departments at some times.

H.     The City compensated HTP trucking companies at a fixed hourly rate based on the size of the truck. Typically, on a monthly basis, participating HTP trucking companies submitted invoices for their monthly work to each Operating Department. Thereafter, the City would process the invoices and remit payments by negotiable instruments known as "warrants" to the particular company via the United States mails.

I.     For each year from 2000 through 2003, the City expended a total of approximately $40 million in City funds for HTP services provided by participating HTP trucking companies to the Operating Departments.

-3-

**Individuals and Entities.**

2.     ANGELO TORRES began working in the HTP Office in or about 1997. In or about the beginning of 2000, TORRES was promoted to the position of Director of the HTP Office, which he held until approximately the end of 2003. As Director of the HTP Office, TORRES was responsible for maintaining a list of companies admitted to the program, and checking on their licenses, insurance, safety, and other matters. If companies were not in compliance with HTP program regulations issued by the City, TORRES, as Director of the HTP Office, had the power to suspend companies from the HTP. Beginning no later than 1996 and continuing through approximately January 2004, TORRES was a full-time salaried employee of the City.

3.     JOHN BOYLE began working for CDOT in or about September 1997, and continued as a seasonal, full-time salaried employee of CDOT through early October 2004. Pursuant to a City policy for seasonal employees, BOYLE was laid off for periods during the winters of 1997-98, 1998-99, and 2003-04. He was also suspended for a month in August-September 2002. BOYLE's formal City position was as a hoisting engineer.

4.     Nick Lococo was a longtime employee of the City until his retirement in 2002. During most of the period 1997 through early 2002, Lococo was the General Foreman of Motor Truck Drivers at CDOT, and was one of the HTP Supervisors. During that time, Lococo had the responsibility to assign hired trucks at CDOT. Lococo died on or about December 9, 2004.

5.     Trucking companies that participated in HTP included, among others, the following:

A.     Elliott, Inc. ("Elliott") was a trucking company founded in or about January 2002. Martin McDonagh ran the day-to-day operations of Elliott. McDonagh also owned and operated McDonagh Concrete, Inc., a company that performed private concrete jobs in

-4-

and around Chicago. Elliott received a total of approximately $100,000 in revenue from the HTP during 2003.

        B.      Company 2, which was owned by CW-2. Company 2 received a total of in excess of $1.4 million in revenue from the HTP during the years 2000-03.

        C.      Company 3, which was owned by CW-3 and CW-2. Company 3 received a total of in excess of $400,000 in revenue from the HTP during the years 2002-03.

        D.      Company 13, which was owned by CW-13. Company 13 received a total of in excess of $100,000 in revenue from the HTP during 2003.

### The Conspiracy.

      6.      Beginning no later than approximately early 2002 and continuing through at least March, 2004, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ANGELO TORRES and
JOHN BOYLE,

defendants herein, did knowingly conspire with Nick Lococo, and with other persons known and unknown to the grand jury, to commit extortion affecting commerce, namely, to obtain property, namely money, from another person, with the person's consent, having induced said consent under color of official right and by wrongful threat of economic harm.

### Means and Method of the Conspiracy.

      7.      It was part of the conspiracy that TORRES admitted Elliott and Companies 2, 3, and 13 to the HTP, and maintained them in the HTP, when they were otherwise ineligible for participation, in exchange for their payments to TORRES and BOYLE and to third parties designated by TORRES and BOYLE.

8.    It was further part of the conspiracy that BOYLE and Lococo solicited and passed payments from Elliott and Companies 2, 3, and 13 to TORRES for the purpose of admitting those companies to, and maintaining them in, the HTP.

9.    It was further part of the conspiracy that TORRES, BOYLE, and Lococo accepted and directed payments from Elliott and Companies 2, 3, and 13, understanding that they were made for the purpose of causing TORRES to admit them to, and maintain them in, the HTP.

10.   It was further part of the conspiracy that defendants BOYLE and TORRES otherwise misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the conspiracy;

All in violation of Title 18, United States Code, Section 1951 and 2.

## COUNT TWO

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The allegations in paragraphs 1–4 of Count One of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      Trucking companies that participated in HTP included, among others, the following (collectively, "the Companies"):

        A.      Elliott, which received a total of approximately $100,000 in revenue from the HTP during 2003.

        B.      Company 1, which was owned by CW-1. Company 1 received a total of more than $300,000 in revenue from the HTP during the years 2001-2003.

        C.      Company 2, which was owned by CW-2. Company 2 received a total of more than $1.4 million in revenue from the HTP during the years 2000-03.

        D.      Company 3, which was owned by CW-3 and CW-2. Company 3 received a total of more than $400,000 in revenue from the HTP during the years 2002-03.

        E.      Company 6, which was owned by CW-6. Company 6 received a total of more than $350,000 in revenue from the HTP during the years 2002-03.

        F.      Company 8, which was owned by CW-8. Company 8 received a total of more than $4 million in revenue from the HTP during the years 2000-03.

        G.      Company 9, which was owned by CW-9. Company 9 received a total of more than $1.7 million in revenue from the HTP during the years 2002-03.

        H.      Company 10, which was owned by CW-10. Company 10 received a total of more than $600,000 in revenue from the HTP during the years 2000-03.

-7-

I.      Company 11, which was owned by CW-11. Company 11 received a total of more than $300,000 in revenue from the HTP during the years 2001-03.

J.      Company 12, which was owned by CW-12. Company 12 received a total of more than $2.7 million in revenue from the HTP during the years 2000-03.

K.      Company 13, which was owned by CW-13. Company 13 received a total of more than $100,000 in revenue from the HTP during 2003.

3.      Jason Martin began working for the City in 1993, and was a full-time salaried employee for the City until November 2004. Martin was a hoisting engineer who worked on a construction crew in CDOT.

4.      Beginning no later than approximately 2000 and continuing to at least approximately May 2004, in the Northern District of Illinois, Eastern Division, and elsewhere:

ANGELO TORRES and
JOHN BOYLE,

defendants herein, along with Jason Martin, Nick Lococo, and others known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the people of the City, and the City, of money, property and the intangible right to the honest services of defendants TORRES, Lococo, and other HTP Supervisors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and material omissions, and in furtherance thereof used the United States mails and other interstate carriers, which scheme is further described in the following paragraphs.

-8-

**Laws and Duties Applicable to City Employees**.

5.　　During their respective employments with the City of Chicago, and pursuant to the Chicago Governmental Ethics Ordinance, TORRES, Lococo, and other HTP Supervisors who worked with them and/or worked with BOYLE each owed a duty of honest services to the City and the people of the City in the performance of their respective public duties.

6.　　Pursuant to the criminal laws of the State of Illinois, all employees of the City were prohibited from: (a) being, in any manner, financially interested, either directly or indirectly, in any contract or the performance of any work in regard to which he may have been called upon to act; (b) receiving, retaining, or agreeing to accept any property or personal advantage which any employee of the City was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered with intent to cause the employee to influence the performance of any act related to the employment or function of the employee's office; (c) soliciting or knowingly accepting, for the performance of any act, a fee or reward which the employee knew he was not authorized by law to accept; (d) soliciting or receiving a contribution from a person engaged in a business or activity over which the employee has regulatory authority; and (e) knowingly acting in concert with an employee who does have regulatory authority to solicit or receive a contribution from a person engaged in a business or activity over which that employee has regulatory authority.

7.　　Pursuant to the Chicago Governmental Ethics Ordinance, all City employees were prohibited from in any way using or attempting to use their respective positions to influence any City governmental decision or action in which an employee knew or had reason to know that he or she had an economic interest distinguishable from its effect on the public generally.  Each employee of

-9-

the City was also required to disclose any economic interest that employee had in a matter, prior to acting on it.

8.    Pursuant to the Chicago Governmental Ethics Ordinance, all City employees were prohibited from accepting anything of value, including, but not limited to, a gift, favor or promise of future employment, based upon any mutual understanding, either explicit or implicit, that the official actions, decisions or judgments of any Official, employee or City contractor, concerning the business of the City would be influenced thereby.  (Non-monetary gifts valued at less than $50 generally were exempted from this provision.)  Any such gift was required to be turned over to the City Comptroller.

9.    Pursuant to the Chicago Governmental Ethics Ordinance, while City employees, TORRES, Lococo, and certain other HTP Supervisors were obligated to file annually a Statement of Financial Interest with the City, wherein they were required to disclose, among other things: (1) the nature of any professional, business or other service rendered by that employee or his or her spouse from which they derived compensation during the preceding calendar year in excess of $5,000;  (2)  the name of any entity from which a gift or gifts valued singly or in the aggregate in excess of $500 was received during the preceding calendar year; and (3) the name and instrument of ownership in any person conducting business in the City, in which the employee had a financial interest during the preceding calendar year.

10.    Pursuant to the Constitution of the State of Illinois, all employees of the City were permitted to use public funds, property and credit only for public purposes.

11.     Pursuant to the Chicago Governmental Ethics Ordinance, all employees of the City were prohibited from knowingly soliciting or accepting any political contribution from a person doing business or seeking to do business with the City.

**Overview of Scheme**.

12.     It was part of the scheme that:

A.     TORRES and certain other HTP Supervisors performed and authorized official City action for the benefit of the Companies that made payments to them and to third parties designated by BOYLE and TORRES.

B.     BOYLE and Lococo solicited and passed payments from the Companies to TORRES and other HTP Supervisors for the purpose of influencing them in the performance of their HTP duties.

C.     TORRES, BOYLE, Lococo, and other HTP Supervisors accepted and directed the payments from the Companies understanding that they were made for the purpose of influencing the HTP Supervisors in the performance of their HTP duties.

D.     TORRES, BOYLE, Lococo, and other HTP Supervisors concealed the payments and the scheme in violation of laws governing City employees.

13.     The was further part of the scheme that the "official City action" referred to above included:

A.     Admission of trucking companies to the HTP when the list of authorized companies was otherwise closed, which list was under the official control of TORRES;

B.     Assignments of trucking companies to HTP work, which assignments were under the official control of certain HTP Supervisors;

-11-

C.    Other valuable consideration and preferential treatment in the HTP, which was under the official control of both TORRES and other HTP Supervisors.

14.    It was further part of the scheme that the "payments" referred to above included:

A.    Money paid to TORRES, BOYLE, Lococo, and certain HTP Supervisors

B.    Money paid to political campaigns and organizations with which TORRES and BOYLE were associated; and

C.    Construction services provided to relatives of Lococo and certain HTP Supervisors.

15.    It was further part of the scheme that the payments to TORRES, BOYLE, and other HTP Supervisors totaled at least $200,000.

**Payments By the Companies**.

Payments Made By Company 1 Representatives to TORRES.

16.    It was further part of the scheme that TORRES met CW-1 in about September 2001 and solicited a $400 "loan" in exchange for giving Company 1 enough work to make $50,000. CW-1 paid the $400. Shortly after that, Company 1 received work for two trucks in the HTP.

17.    It was further part of the scheme that TORRES continued to accept payments for the benefit of Company 1 until February 2003, including on three occasions after CW-1 began cooperating with the federal investigation in September, 2002.

Payments Made by Company 2 Representative to BOYLE and TORRES.

18.    It was further part of the scheme that CW-2 made a series of payments to BOYLE on behalf of Company 2. In the summer of 1999, BOYLE solicited a $500 contribution to a political organization, which CW-2 made, in exchange for offering assistance in entering the HTP. After

Company 2 had one truck added to the HTP in 2000, BOYLE met CW-2 and said that he had to take care of his "guys." Within a few days, CW-2 paid BOYLE about $2,000.

19.     It was further part of the scheme, that after the first payment, BOYLE continued to solicit cash and loans from CW-2. CW-2 paid a total of more than $100,000 to BOYLE for the work of Company 2 in the HTP between 2000 and 2003. In December, 2003, BOYLE said CW-2 owed $7,000 for the year to the "guys" for the work of Company 2, and CW-2 gave BOYLE a check in that amount.

20.     It was further part of the scheme that in addition to cash payments, BOYLE regularly solicited political contributions from CW-2 for certain political organizations, and CW-2 regularly made such payments.

21.     It was further part of the scheme that in or around August, 2002, TORRES solicited a political contribution from CW-2.

22.     It was further part of the scheme that during the summer of 2003, CW-2 was called by a City employee because there was a problem with a driver for Company 14, which is owned by a relative of CW-2. CW-2 met TORRES. TORRES resolved the situation, and then accepted $250 in cash from CW-2.

23.     It was further part of the scheme that in October or November of 2003, CW-2 gave BOYLE an $800 payment for TORRES, in return for TORRES correcting an overbilling problem CW-2 had with the City.

Payments Made by Company 3 Representatives to BOYLE and TORRES.

24.     It was further part of the scheme that BOYLE and TORRES solicited cash payments from CW-3, who had an ownership interest in Company 3. CW-3 met with BOYLE, who promised

to assist Company 3 in getting HTP work. Following the assignment of Company 3 trucks to the HTP, BOYLE repeatedly solicited CW-3 for money, and CW-3 made certain payments at the direction of BOYLE.

25.     It was further part of the scheme that CW-3 paid BOYLE $4,000 in cash in order to have TORRES reinstate Company 3's trucks after TORRES suspended Company 3's trucks from the HTP.

<u>The May 12, 2004 Payment to BOYLE from CW-2 for Company 3.</u>

26.     It was further part of the scheme that CW-2 made a payment to BOYLE for the benefit of Company 3 in May 2004. After CW-2 and CW-3 began cooperating with the federal investigation, BOYLE told CW-2 in April 2004 that CW-3 owed BOYLE $30,000 for the past two years, for both political fundraising tickets and cash payments.

27.     It was further part of the scheme that BOYLE agreed with CW-2 that CW-3 would pay BOYLE $5,000 for adding an additional truck for Company 3. On May 12, 2004, CW-3 provided CW-2 with a $5,000 check from Company 3, with no named payee, which CW-2 then gave to BOYLE as payment for Company 3's participation in the HTP. The $5,000 check was cashed by BOYLE. Shortly thereafter, the City called out an additional truck from Company 3.

<u>Payments Made by Company 6 Representative to BOYLE and Martin.</u>

28.     It was further part of the scheme that Jason Martin told CW-6 in or about 2000 that Company 6 could get into the HTP through BOYLE. Martin arranged a meeting between CW-6 and BOYLE in 2000, where BOYLE solicited $6,000 per truck per year, in exchange for work in the HTP. CW-6 did not agree to pay the amount, but applied to the HTP. Company 6 was approved for the HTP in 2001, but received only limited work in 2001.

29.     It was further part of the scheme that Martin arranged a second meeting between BOYLE and CW-6 in early 2002. At that meeting, BOYLE agreed to help Company 6 get HTP work, and instructed CW-6 to make two $1,250 contributions to Ward Organization A. BOYLE also told CW-6 that he would charge CW-6 $6,000 for each truck added to the City. After Company 6's trucks were assigned work later in 2002, BOYLE met with CW-6 and demanded payments. CW-6 first paid BOYLE $5,000 in cash in an envelope.

30.     It was further part of the scheme that CW-6 paid BOYLE periodically thereafter through early 2004, in an amount totaling approximately $57,000. During the course of their dealings, BOYLE told CW-6 that he wanted money to take care of other "guys," and specifically mentioned Lococo.

31.     It was further part of the scheme that Martin solicited CW-6 for payment in exchange for his introduction of CW-6 to BOYLE. CW-6 agreed to give Martin a one-half ownership interest in the second truck of Company 6 that would be working for the City. CW-6 paid Martin approximately $15,000 between 2002 and 2004, in periodic payments.

Payments Made by Martin McDonagh to BOYLE and Lococo.

32.     It was further part of the scheme that in early 2003, Martin McDonagh submitted paperwork for Elliott to join the HTP to TORRES, at BOYLE's suggestion. After TORRES rejected Elliott because the HTP was formally closed to new companies, BOYLE instructed McDonagh to meet Lococo at a restaurant, and to bring money and the paperwork. After McDonagh delivered at least $1,000 and the paperwork to Lococo, BOYLE told McDonagh that Elliott was accepted in the HTP. Within a few weeks, McDonagh's trucks began receiving HTP work.

33.     It was further part of the scheme that after Elliott began working for the City, BOYLE solicited McDonagh for loans and cash. McDonagh gave cash and checks to BOYLE.

34.     It was further part of the scheme that in late 2003, TORRES told McDonagh that he would be suspended if he did not come in and "officially thank" him for admitting him into the HTP. After speaking with TORRES, McDonagh called BOYLE and told him what had happened. BOYLE told McDonagh that BOYLE would call Lococo and that Lococo would take care of it. After the conversations, McDonagh took no further action, and Elliott was never suspended.

35.     It was further part of the scheme that BOYLE solicited McDonagh to make political contributions, and McDonagh did pay political contributions at BOYLE's request.

Payments Made by Representatives of HTP Companies 8 and 9 to TORRES.

36.     It was further part of the scheme that TORRES solicited and accepted cash payments and other items of value, including political contributions, from CW-8, a representative of Company 8, and from CW-9, a representative of Company 9. CW-8 gave gift certificates each year to TORRES during the years 2000-03, as well as a $300 cash payment on one occasion. CW-9 provided TORRES cash payments and gift certificates in 2002 and 2003.

Payments Made by Company 10 to TORRES.

37.     It was further part of the scheme that TORRES accepted cash payments from CW-10, one of the owners of Company 10, in return for and in conjunction with receiving HTP work. CW-10 made cash payments to TORRES of $500 in 2002 and $600 in 2003.

38.     It was further part of the scheme that TORRES solicited CW-10 for political contributions in 2001 and 2002 for State Senator A, and CW-10 made the contributions requested by TORRES.

-16-

Payments Made by Company 11 to TORRES.

39.     It was further part of the scheme that TORRES accepted things of value from CW-11, the owner of Company 11.   After an additional truck was called out by the City from Company 11 in 2001, CW-11 gave TORRES gift certificates in 2001, and cash in 2002.

40.     It was further part of the scheme that in 2001 or 2002, TORRES solicited CW-11 to sponsor a portion of a fundraising outing for State Senator A.  CW-11 gave TORRES $500.

Payments Made by Company 12 to Lococo and TORRES.

41.     It was further part of the scheme that Lococo and TORRES accepted cash payments from CW-12, the owner of Company 12. In 2000 and 2001, Lococo accepted cash payments of $400 from CW-12. In 2002 and 2003, TORRES accepted cash payments of $400 from CW-12. Company 12 received regular work in the HTP.

Payments Made by Company 13 to BOYLE.

42.     It was further part of the scheme that in late 2002 or early 2003, CW-13 met with BOYLE and others about getting into the HTP.  BOYLE said that he could get trucks added to the HTP, for $30,000, along with additional payments.  CW-13 paid BOYLE at least $28,000, and formed Company 13.

43.     It was further part of the scheme that thereafter Company 13's trucks were added to the HTP, despite the fact that the program was closed.

Free Construction Services by CW-2.

44.     It was further part of the scheme that BOYLE requested CW-2 to perform free construction services for certain HTP Supervisors and/or their families.  CW-2, who also ran a construction company, performed construction work on the houses of two relatives of Lococo, at

BOYLE's request. Following his performance of the work, BOYLE asked CW-2 for an invoice showing the value of the work, so that BOYLE and CW-2 could receive credit for the value of the work. CW-2 also performed work for certain HTP Supervisors. In each case, CW-2 was not paid for the work.

**Acts Of Concealment And Obstruction.**

45. It was further part of the scheme that, on or about March 28 and 30, 2004, defendant BOYLE obstructed and attempted to obstruct the grand jury investigation, by coaching CW-2 to present a false story if interviewed and directing him/her to destroy evidence. Said conduct included an instruction by BOYLE to CW-2 to "shred" certain documents relating to work performed at BOYLE's request for certain HTP Supervisors.

46. It was further part of the scheme that defendants TORRES and Lococo failed to disclose the receipt of any gifts, cash payments or campaign contributions from the Companies to any City official, including for TORRES and Lococo, on their respective Statements of Financial Interest, filed annually with the City Board of Ethics.

47. It was further part of the scheme that defendants TORRES, BOYLE, and Martin, along with Lococo and McDonagh and other representatives of the Companies misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the scheme.

48. On or about March 11, 2004, at Chicago, in the Northern District of Illinois, Eastern Division,

ANGELO TORRES, and
JOHN BOYLE,

-18-

defendants herein, along with Nick Lococo and CW-2 and CW-3, for the purpose of executing the

aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according

to the direction thereon an envelope containing a City warrant addressed to Company 3 at a Chicago,

Illinois address;

    In violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT THREE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.    The allegations in paragraphs 1–2 of Count One and paragraphs 2(B), 4-17, and 46-47 of Count Two of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.    On or about February 27, 2003, at Chicago, in the Northern District of Illinois, Eastern Division,

### ANGELO TORRES,

defendant herein, for the purpose of executing the aforesaid scheme, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon an envelope containing a City warrant addressed to Company 1 at a Chicago, Illinois address;

In violation of Title 18, United States Code, Sections 1341 and 1346.

## COUNT FOUR

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      On or about November 1, 2002, at Chicago, in the Northern District of Illinois,

Eastern Division,

### ANGELO TORRES,

defendant herein, attempted to commit extortion affecting commerce, in that he obtained $500 in

cash from CW-1, with that person's consent, induced under color of official right;

In violation of Title 18, United States Code, Section 1951(a).

-21-

## COUNT FIVE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     From in or about January 2001 to in or about December 2001, at Chicago, in the Northern District of Illinois, Eastern Division,

### ANGELO TORRES,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of trucking companies, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2001, to December 31, 2001;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SIX

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      From in or about January 2002 to in or about December 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

### ANGELO TORRES,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of trucking Companies, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2002, to December 31, 2002;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT SEVEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      From in or about January 2003 to in or about December 2003, at Chicago, in the

Northern District of Illinois, Eastern Division,

### ANGELO TORRES,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit

and the benefit of associates, and accepted and agreed to accept things of value from representatives

of trucking companies, intending to be influenced or rewarded in connection with the awarding of

City trucking business in a series of transactions having a value of $5,000 or more, involving the

City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period

from January 1, 2003, to December 31, 2003;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT EIGHT

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The allegations in paragraphs 2(E) and 28-31 of Count Two of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      From in or about January 2002 to in or about December, 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

JOHN BOYLE, and
JASON MARTIN,

defendants herein, being agents of the City of Chicago, corruptly solicited and demanded for their own benefit, and for the benefit of associates, and accepted and agreed to accept things of value from representatives of Company 6, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2002, to December 31, 2002;

In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

-25-

## COUNT NINE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1. From in or about January 2000 to in or about December 2000, at Chicago, in the Northern District of Illinois, Eastern Division,

JOHN BOYLE,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of Company 2, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2000, to December 31, 2000;

In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

## COUNT TEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     From in or about January 2001 to in or about December 2001, at Chicago, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of Company 2, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2001, to December 31, 2001;

In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

## COUNT ELEVEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The allegations in paragraphs 2(C)-(D), 18-20, and 24 of Count Two of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      From in or about January 2002 to in or about December 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of Company 2 and Company 3, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2002, to December 31, 2002;

·In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

## COUNT TWELVE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.    From in or about January 2003 to in or about November 28, 2003, at Chicago, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit and the benefit of associates, and accepted and agreed to accept things of value from representatives of Company 2, Company 3, Company 6, and Elliott, intending to be influenced or rewarded in connection with the awarding of City trucking business in a series of transactions having a value of $5,000 or more, involving the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2003, to December 31, 2003;

In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

## COUNT THIRTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The allegations in paragraphs 2(C) and 26-27 of Count Two of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      On or about May 12, 2004, at Chicago, in the Northern District of Illinois, Eastern Division,

JOHN BOYLE,

defendant herein, being an agent of the City, corruptly solicited and demanded for his own benefit, and accepted and agreed to accept $5,000 from representatives of Company 3, intending to be influenced or rewarded in connection with the awarding of City trucking business; the City, being an agency that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2004, to December 31, 2004;

In violation of Title 18, United States Code, Section 666(a)(1)(B) and 2.

## COUNT FOURTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The SPECIAL AUGUST 2003-2 GRAND JURY, in connection with Grand Jury Investigation No. 02 GJ 1348, was conducting an investigation into possible violations of Title 18, United States Code, Sections 666, 1001, 1341, 1346, 1503, 1951, among other violations of federal law, in connection with the City's HTP. The issuance of Grand Jury subpoenas had been confirmed by the City of Chicago, and was the subject of prominent media reports.

2.      By no later than March 10, 2004, it was material to the Grand Jury Investigation whether or not representatives of certain trucking companies, including CW-2, provided cash payments, campaign contributions, or other things of value to City employees, including BOYLE.

3.      On March 10, 2004, federal agents began a coordinated series of interviews of companies that participated in the HTP. In the interviews, federal agents inquired as to whether City employees solicited companies participating in the HTP for cash payments and political contributions.

4.      Beginning no later than March 10, 2004, defendant BOYLE was notified of one or more of these interviews.

5.      On or about March 12, 2004, CW-2 met with federal agents and began providing information about his/her payment of things of value to BOYLE relating to the HTP. CW-2 stated that he/she also provided free construction services to certain HTP Supervisors, and had kept notes thereof.

6.      On or about March 28, 2004, defendant BOYLE met with CW-2. During that meeting, BOYLE discussed his awareness of the federal investigation of the HTP.

7.   On or about March 30, 2004, defendant BOYLE again met with CW-2. During that meeting, BOYLE directed CW-2 to shred his/her "black books" of notes concerning construction jobs CW-2 had worked, including jobs for certain HTP Supervisors.

8.   On or about March 30, 2004, in Chicago, Illinois, Northern District of Illinois, Eastern Division,

JOHN BOYLE,

defendant herein, endeavored to influence, obstruct, and impede the due administration of justice; namely, that defendant BOYLE, knowing of the Grand Jury Investigation into the HTP, directed CW-2 to shred evidence so it would not be available to the grand jury investigation;

In violation of Title 18, United States Code, Sections 1503(a).

## COUNT FIFTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The allegations in Paragraphs 1-7 of Count Fourteen of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.      From on or about March 28, 2004 through on or about March 30, 2004, in Chicago, Illinois, Northern District of Illinois, Eastern Division,

JOHN BOYLE,

defendant herein, corruptly persuaded another person, namely, CW-2, and attempted to do the same, with the intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a federal offense in violation of federal law;

In violation of Title 18, United States Code, Sections 1512(b)(3).

-33-

## COUNT SIXTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The allegations in paragraphs 1-5(A) of Count One and paragraphs 32-35 of Count Two of this indictment are hereby realleged and incorporated herein as if fully set forth.

2.     At times material to this Count:

A.     After TORRES rejected Elliott's application, BOYLE directed MARTIN McDONAGH to bring $1,500 to Lococo. BOYLE subsequently informed McDONAGH that Elliott had been accepted into the HTP, even though the program was officially closed. Elliott was admitted into the HTP when it was closed in exchange for McDONAGH's payments to BOYLE and Lococo.

C.     Between in or about March 2003 and on or about June 30, 2004, Elliott had four trucks that worked in the HTP, mostly for Streets and Sanitation and the Water Department. During this time, McDONAGH made three payments to BOYLE in exchange for BOYLE helping Elliott receive work in the City's HTP. On or about May 5, 2003, McDONAGH wrote a $12,000 check to BOYLE on the account of McDonagh Concrete. On or about June 24, 2003, McDONAGH wrote a $10,000 check to BOYLE on the account of McDonagh Concrete. On or about August 11, 2003, McDONAGH wrote a $7,700 check to BOYLE on the account of McDonagh Concrete.

D.     BOYLE also solicited McDONAGH for campaign contributions. On or about October 15, 2003, in response to a request by BOYLE, McDONAGH wrote a check for $1,000 to Ward Organization A. On or about March 15, 2004, in response to a request by BOYLE, McDONAGH wrote a check for $1,500 to Ward Organization A. McDONAGH's

understanding was that making the contributions BOYLE requested would assist Elliott in getting HTP work.

E.     Elliott received over $179,675 from the City in 2003 and 2004. Elliott did not reapply to the HTP by June 30, 2004. As a result, Elliott was dismissed from the HTP.

3.     At times material to this Count:

A.     The SPECIAL AUGUST 2003-2 GRAND JURY was investigating, among other things, allegations of corruption relating to the HTP.

B.     By June 30, 2004, John BOYLE and Nick Lococo were being investigated as part of the HTP inquiry.

C.     The following matters, among others, were material to the SPECIAL AUGUST 2003-2 GRAND JURY's investigation concerning the HTP:

i.     The nature and scope of personal and financial relationships between companies participating in the HTP and current and former City officials and employees, including BOYLE and Lococo;

ii.    Whether companies participating in the HTP gave cash, checks, loans, gifts, political contributions, or other things of value to current and former City officials and employees, including BOYLE and Lococo;

iii.   Whether current and former City officials and employees, including BOYLE and Lococo, solicited cash, checks, loans, gifts, political contributions, or other things of value from companies participating in the HTP;

iv.    Whether current and former City officials and employees, including BOYLE and Lococo, performed favors or secured HTP business for companies

-35-

participating in the HTP, in exchange for or in connection with cash, checks, loans, gifts, political contributions, or other things of value; and

        v.      Whether the offering or receipt of cash, checks, loans, gifts, political contributions, or other things of value were concealed through the actions of companies participating in the HTP and/or current and former City officials and employees, including BOYLE and Lococo.

4.      At times material to this Count:

        A.      McDONAGH was interviewed by federal law enforcement on or about June 30, 2004 and July 27, 2004.

        B.      During the June 30 interview, agents questioned McDONAGH concerning, among other things, his business with the City and his interactions with City employees relating to the HTP. In particular, agents asked McDONAGH whether any City employee ever asked him for money, loans, gifts, or political contributions, and whether he ever gave cash or checks to a City employee. McDONAGH falsely stated that no City employee ever asked him for money, loans, or gift. McDONAGH also falsely stated that he never had given cash or checks to any City employee. McDONAGH said that he had given political contributions over the years but falsely denied that anyone insinuated or suggested to him that he had to make the contributions.

        C.      On or about July 27, 2004, McDONAGH met with agents at his home in Naperville, Illinois. Agents questioned McDONAGH concerning, among other things, his business with the City and his interactions with City employees, including BOYLE. When agents asked specifically about BOYLE, McDONAGH said, "Why does that name sound

-36-

familiar?" McDONAGH further stated, falsely, that he knew the name BOYLE but didn't know from where. When asked whether McDONAGH had ever done business with BOYLE of any kind, McDONAGH falsely answered no. In addition, agents asked McDONAGH whether he or any of his companies had ever given any checks or cash to BOYLE. McDONAGH falsely stated that neither he nor his companies had ever given any checks or cash to BOYLE.

D.     In truth and fact, as detailed above and as defendant well knew, McDONAGH and his company McDonagh Concrete did give checks to BOYLE and cash to Lococo.

5.     On or about July 27, 2004, in Naperville, Illinois, in the Northern District of Illinois, Eastern Division,

MARTIN McDONAGH,

defendant herein, did knowingly and willfully make materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, in that defendant falsely stated that neither he nor any of his companies gave checks to John BOYLE, when in fact, as defendant there and then knew, he and his company McDonagh Concrete had given at least two checks to John BOYLE;

In violation of Title 18, United States Code, Section 1001(a)(2).

-37-

## COUNT SEVENTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     On or about April 14, 2002, in the Northern District of Illinois, Eastern Division,

ANGELO TORRES,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be

made and subscribed, a joint United States Individual Income Tax Return (Form 1040 with schedules

and attachments) for the calendar year 2001, which return was verified by a written declaration that

it was made under the penalties of perjury, and filed with the Internal Revenue Service, which return

he did not believe to be true and correct as to every material matter, in that it was stated on line 22

in that return that the total income was $106,367, while defendant knew that statement was false in

that the defendant failed to report additional gross income received in calendar year 2001, including

income related to payments from representatives of trucking companies;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT EIGHTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     On or about April 16, 2003, in the Northern District of Illinois, Eastern Division,

ANGELO TORRES,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be

made and subscribed, a United States Declaration for an IRS E-File Return (Form 8453) for the

calendar year 2002, which accompanied a joint United States Individual Income Tax Return (Form

1040 with schedules and attachments), which return was verified by a written declaration that it was

made under the penalties of perjury and was filed electronically with the Internal Revenue Service,

which return he did not believe to be true and correct as to every material matter, in that it was stated

on line 22 in that return that the total income was $103,440, while defendant knew that statement

was false in that the defendant failed to report additional gross income received in calendar year

2002, including income related to payments from representatives of trucking companies;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT NINETEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      On or about March 1, 2004, in the Northern District of Illinois, Eastern Division,

ANGELO TORRES,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be
made and subscribed, a joint United States Individual Income Tax Return (Form 1040 with schedules
and attachments) for the calendar year 2003, which return was verified by a PIN number under the
penalties of perjury, and filed electronically with the Internal Revenue Service, which return he did
not believe to be true and correct as to every material matter, in that it was stated on line 22 in that
return that the total income was $82,133, while defendant knew that statement was false in that the
defendant failed to report additional gross income received in calendar year 2003, including income
related to payments from representatives of trucking companies;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      On or about April 15, 2001, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be made and subscribed, an individual United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2000, which return was verified by a written declaration that it was made under the penalties of perjury, and filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it was stated on line 22 in that return that the total income was $71,106, while defendant knew that statement was false in that the defendant failed to report additional gross income received in calendar year 2000, including income related to payments from representatives of trucking companies;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-ONE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     On or about April 15, 2002, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be

made and subscribed, an individual United States Individual Income Tax Return (Form 1040 with

schedules and attachments) for the calendar year 2001, which return was verified by a written

declaration that it was made under the penalties of perjury, and filed with the Internal Revenue

Service, which return he did not believe to be true and correct as to every material matter, in that it

was stated on line 22 in that return that the total income was $66,801, while defendant knew that

statement was false in that the defendant failed to report additional gross income received in calendar

year 2001, including income related to payments from representatives of trucking Companies;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-TWO

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.　　　　On or about January 29, 2004, in the Northern District of Illinois, Eastern Division,

### JOHN BOYLE,

defendant herein, a resident of Chicago, Illinois, willfully made and subscribed, and caused to be made and subscribed, an individual United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2002, which return was verified by a written declaration that it was made under the penalties of perjury, and filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it was stated on line 22 in that return that the total income was $45,553, while defendant knew that statement was false in that the defendant failed to report additional gross income received in calendar year 2002, including income related to payments from representatives of trucking companies;

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE ALLEGATION

The SPECIAL AUGUST 2003-2 GRAND JURY further alleges:

1.      The allegations contained in Counts Two through Three of this indictment are realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of their violations of Title 18, United States Code, Section 1341 and 1346, as alleged in the foregoing indictment,

ANGELO TORRES and
JOHN BOYLE,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offenses.

3.      The interests of the defendants subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include but are not limited to:

(a)     All financial benefits and proceeds defendant TORRES and BOYLE received related to HTP work, including, without limitation, over $200,000 in cash payments, campaign contributions and other things of value obtained from the Companies.

4.      If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendants:

(a)     Cannot be located upon the exercise of due diligence;

-44-

(b)     Has been transferred or sold to, or deposited with, a third party;

(c)     Has been placed beyond the jurisdiction of the Court;

(d)     Has been substantially diminished in value; or

(e)     Has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property under the provisions

of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c), including without limitation, the following:

(1)     the real property commonly known as 6935 North Wildwood, Chicago, Illinois, legally described as:

LOT 232 AND 231 IN ELMORE'S WILDWOOD, BEING A SUBDIVISION OF THAT PART OF THE NORTHERLY 80 ACRES OF THE NORTHEASTERLY ½ OF CALDWELL'S RESERVE, BEING A TRACT OF LAND IN TOWNSHIPS 40 AND 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES WESTERLY OF THE RIGHT OF WAY OF THE CHICAGO MILWAUKEE AND ST. PAUL RAILROAD COMPANY ACCORDING TO THE PLAT THEREOF RECORDED JUNE 26, 1924 AS DOCUMENT 8486322 IN COOK COUNTY, ILLINOIS.

Permanent Index Numbers: 10-32-212-009 AND 10-32-212-010.

(2)     the real property commonly known as 410 South Prospect, Park Ridge, Illinois, legally described as:

THE SOUTH ½ OF LOT 9 AND ALL OF LOTS 10 AND 11 IN BLOCK 2 IN DALE, GUSTIN AND WALLACE'S ADDITION TO PARK RIDGE, A SUBDIVISION OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 35, TOWNSHIP 41 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Permanent Index Number: 09-35-218-020-0000.

(3)     the real property commonly known as 2100 North Mason, Chicago, Illinois, legally described as:

-45-

LOT 25 IN THE RESUBDIVISION OF PART OF GRANDVIEW, BEING JOHN T. KELLY AND OTHERS SUBDIVISION OF THAT PART OF THE WEST ½ OF THE NORTHEAST 1/4 OF SECTION 32, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, SOUTH OF THE CENTER LINE OF GRAND AVENUE AND NORTH OF THE SOUTH LINE OF DICKENS AVENUE, IN COOK COUNTY, ILLINOIS.

Permanent Index Number: 13-32-219-056-0000.

5      The defendants TORRES and BOYLE are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON

UNITED STATES ATTORNEY

No. 04 CR 86

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

vs.

ANGELO TORRES,
JOHN BOYLE,
JASON MARTIN, and
MARTIN McDONAGH

# I N D I C T M E N T

Violations:   Title 18, United States Code,
Sections 2, 666, 1001, 1341,
1346, 1503, 1512(b), and 1951
Title 26, United States Code,
Section 7206(1)

A true bill,

_____
                        Foreman

Filed in open court this 27th day of January, A.D. 20 05

by Barbara Frame

# MICHAEL W. DOBBINS                Clerk

Bail, $ _____

PO 880.320